**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ATOBRHAN GODLU, Derivatively On Behalf Of VROOM, INC., | |
| Plaintiff, | |
| vs. | **Case No.:** |
| PAUL J. HENNESSY, ROBERT J. MYLOD, JR., SCOTT A. DAHNKE, MICHAEL FARELLO, LAURA W. LANG, LAURA G. O'SHAUGHNESSY, DAVID K. JONES, PATRICIA MORAN, AND MARK E. ROSZKOWSKI, | **JURY DEMANDED** |
| Defendants, | |
| -and- | |
| VROOM, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

Plaintiff Atobrhan Godlu ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Vroom, Inc. ("Vroom" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Vroom with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits (*i.e.*, *In re: Vroom, Inc. Securities Litigation*, Case

No. 1:21-cv-02477- PGG (the "Securities Class Action"), and matters of public record.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTTION**</u>

1.     This is a shareholder derivative action brought on behalf of and for the benefit of the Company, against certain of its officers and/or directors named as defendants herein seeking to remedy Defendants (defined below) violations of Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred from June 9, 2020 to the present (the "Relevant Period"). Defendants' actions have caused, and will continue to cause, substantial financial harm and other damages to the Company, including damages to its reputation and goodwill.

2.     This case arises from the failure of the Company and its senior officers and directors to disclose to the market the Company's true financial prospects and operating condition.

3.     On June 9, 2020, the Company became a public company wherein it sold 24,437,500 shares of common stock for $22.00 per share, receiving proceeds of around $504 million (the "IPO").[1]  Prior to the IPO, and as a result of the COVID-19 pandemic, the Company reduced its inventory and fired one-third of its workforce.  When demand trends reversed, the Company represented to the market that it was well-positioned to take advantage of high consumer demand for online used car purchases.

4.     For instance, in the Company's IPO Offering Materials, the Company stated that it was "currently building [its] inventory to take advantage of [its] position and value proposition in

---

[1]     On June 9, 2020, the Company filed a prospectus for the IPO with the SEC, which incorporated and formed part of the Registration Statement for the offering (the "IPO Offering Materials").

the used automotive market" and was positioned to take advantage of "enhanced opportunities arising from greater consumer acceptance of [its] business model as a result of the COVID-19 disruptions." The Company also reported that in April 2020 it "began to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that [it] believe[d] w[ould] convert at target margins" and that it "intend[ed] to strategically build [its] inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels."

5.      The IPO Offering Materials also reported how the Company's business had "grown significantly as [it had] scaled [its] operations . . .," and that this "growth [was] not attributable to a single innovation or breakthrough" but was instead due to "multiple strategies that serve as points" on the Company's "Growth Flywheel":



6.     As the Company reported: "*[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel.*"

7.     The Company also promoted the advantages of what it called its "asset-light" business strategy, whereby the Company abandoned its need for ownership of assets in favor of a business model that relied on contracts with third-party service providers to assist in facilitating functions that would be controlled in-house.  The Company claimed to the market that outsourcing these critical functions of its business brought down risk and capital investment, thereby improving the Company's ability to scale its business while also reducing risk.

8.     The Company also outsourced its "Customer Experience" function, key to the Company's Growth Flywheel that operated the Company's primary call center and performed many function required in the process of converting a potential Company customer into an actual Company customer.  The Company's Customer Experience function was outsourced to investor Rock Connections LLC ("Rock Connections"), under an agreement signed by Defendant Hennessy.

9.     Defendants ensured that the agreement between the Company and Rock Connections gave the Company and its executives unlimited access to monitor the customer service being provided by Rock Connections to the Company's customers.  The Company's agreement with Rock Connections: (i) mandated that Rock Connections provide all customer service in accordance with the Company's policies and procedures; (ii) required that Rock Connections "enter and save all required information" in granular detail in the Company's customer relationship management ("CRM") system, making it accessible to the Company's senior executives and management; (iii) allowed the Company control over Rock Connections' staffing and training of staff; and (iv) allowed the Company's senior executives and management

unfettered access to monitor the customer support being provided to potential customers, including monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits by Company personnel to Rock Connections' facility, the provision of weekly reports to Company management, and a requirement for weekly meetings between representatives of Rock Connections and the Company.

10.     Throughout the Relevant Period, Defendants claimed that the Company's Growth Flywheel were driving increased sales, praising the Company's "*[e]normous inventory selection*" and "*[e]xceptional customer support*" while asserting on multiple occasions that the Company offered "*an exceptional ecommerce experience for [its] customers*." Defendants also caused the Company to inform the market that consistent with the Company's Growth Flywheel, "customer experience" was "fundamental to the growth of [its] business" and that the Company maintained a "*deep[] commit[ment] to creating an exceptional experience for [its] customers*."

11.     Analysts and the market were aware of the Company's asset-light strategy and outsourcing of critical functions, and they monitored any developments with respect to those third-party relationships given their importance to the Company's Growth Flywheel and ability to convert customers and increase sales. With no sign of any impediment in the Company's path to capitalizing on extraordinary demand for online used car sales, the Company's stock price rose from $22 per share to a close of $73.87 per share on September 1, 2020. One week later, *and only a few weeks from the end of the third quarter of 2020*, the Company would take advantage of its escalating share price by reporting the September 2020 SPO. In doing so, the Company also provided an update to the market on its operational and financial results, *raising the Company's third quarter financial guidance and informing the market that it was performing "better than expected*."

peration

12.     On September 8, 2020, Defendants caused the Company to file with the SEC a registration statement on Form S-1 for the September 2020 SPO (the "SPO Registration Statement"), followed by the filing of the prospectus for the September 2020 SPO on September 11, 2020 (the "SPO Prospectus") (collectively, the "SPO Offering Materials").  The SPO Offering Materials made the same representations to the market that were made in connection with the IPO, including attributing the Company's growth to the Company's Growth Flywheel, promoting the Company's "[e]normous inventory selection" and "[e]xceptional customer support," and counting the Company's purported ability to offer a superior Customer Experience as a key factor differentiating the Company from "traditional auto dealers and the peer-to-peer market."

13.     *As with the IPO Offering Materials, the SPO Offering Materials made representations about the Customer Experience offered by the Company*, reporting that the Company had "partnered with a leading customer experience management provider to operate [its] primary call center" which enabled it "*to centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies*." The Company also represented to the market that its "*professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed*."  On this information, the Company sold 10.8 million shares of its common stock at $54.50 per share for nearly $590 million in gross offering proceeds in the September 2020 SPO.

14.     *However, the truth was different from what Defendants openly claimed*.  Far from offering the "[e]xceptional customer support" that the Company promoted to the market from the time of its IPO, and doubled down on to successfully orchestrate its September 2020 SPO, the Company's Customer Experience had been in a free-fall since as early as January 2020, over five

months before the Company's IPO and *over eight months before the September 2020 SPO.*

15.     The Better Business Bureau of Greater Houston and South Texas ("BBB") found that: "*[b]eginning in January 2020, BBB began receiving complaints and customer reviews [about the Company] which exhibited several different patterns*" including complaints from the Company customers asserting that: (a) "the vehicle[] they purchased from photos was not the vehicle they received;" (b) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (c) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (d) "cars were left in a parking lot or driveway at night with the keys left in them." Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns," "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in.  The BBB has also stated that "*[s]ince January [2020], the pattern of [Company] complaints has not trended down but has actually increased,*" with "new patterns of complaints" in June 2020 focused on "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."

16.     The BBB initiated proceedings to revoke the Company's BBB accreditation.  *On September 2, 2020, just before the Company announced the September 2020 SPO, the BBB revoked the Company's accreditation due to its failures to adhere to and abide by BBB standards and duly notified the Company of its action*.  The September 2020 SPO Offering Materials made no mention of the BBB proceedings to revoke the Company's accreditation.  Instead, Defendants chose to mention the BBB only in the context of a generic statement that consumer complaints posted on "consumer platforms such as the Better Business Bureau" "*could*" diminish consumer

confidence in the Company, "***irrespective of the[] validity***" of any such complaints.

17.     Contrary to the Company's representation that "***higher inventory levels lead to higher conversion***," the Company's Customer Experience constituted an undisclosed roadblock to sales conversion on the Company's Growth Flywheel that was having a materially negative impact on the Company's bottom line.  ***The representations made by Defendants concerning the Company's Customer Experience and the importance of its increased inventory levels, and specifically in the Company's SPO Offering Materials, conflicted with the true state of affairs they knew existed within the Company at the time those statements were made***.

18.     The market learned about the true state of the Company's Customer Experience and its negative effect on the Company's ability to maximize sales conversion through two corrective disclosures on November 11, 2020 and March 3, 2021 that: (i) the Company's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (ii) the Company's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (iii) as a result of (i)-(ii) above, the Company needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, impairing the Company's short-term profitability; and (iv) as a result of (i)-(iii) above, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market. In fact, contrary to specific representations Defendants made to the market, the Company was never "well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce."

19.     Following these disclosures, the Company's stock price dropped over 42%.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

22.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this Court in accordance with 28 U.S.C. § 1391 because the Company is incorporated in Delaware.

## PARTIES

**Plaintiff**

24.     Plaintiff owns Vroom stock and will continue to hold his Vroom shares throughout the pendency of this action.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

25.     Nominal Defendant Vroom, a Delaware corporation headquartered in New York, New York, is an ecommerce platform that buys and sells used vehicles. Through the Company's online platform, consumers can research and select from thousands of reconditioned vehicles.

Vroom's common stock trades on the NASDAQ exchange under the symbol "VRM."

**Director Defendants**

26.     ***Defendant Paul Hennessy*** ("Hennessy") has served as the Company's Chief Executive Officer ("CEO") and as a director since June 2016.  For the fiscal year ended December 31, 2020, Defendant Hennessy received $4,315,077 in total compensation from the Company. Defendant Hennessy is named as a defendant in the Securities Class Action.

27.     ***Defendant Robert J. Mylod, Jr.*** ("Mylod") has served as a Company director since September 2015 and is Chairperson of the Board and Chair of the Audit Committee.  Defendant Mylod is named as a defendant in the Securities Class Action.

28.     ***Defendant Scott A. Dahnke*** ("Dahnke") has served as a Company director since July 2015.  Defendant Dahnke is named as a defendant in the Securities Class Action.

29.     ***Defendant Michael J. Farello*** ("Farello") has served as a Company director since July 2015.  Defendant Farello is named as a defendant in the Securities Class Action.

30.     ***Defendant Laura W. Lang*** ("Lang") has served as a Company director since May 18, 2020. She serves as a member of the Audit Committee. Defendant Lang is named as a defendant in the Securities Class Action.

31.     ***Defendant Laura G. O'Shaughnessy*** ("O'Shaughnessy") has served as a Company director since May 18, 2020. Defendant O'Shaughnessy is named as a defendant in the Securities Class Action.

32.     Defendants Hennessey, Mylod, Dahnke, Farello, Lang and O'Shaughnessy are herein referred to as "Director Defendants."

**Officer Defendant**

33.     ***Defendant David K. Jones*** ("Jones") served as the Company's Chief Financial

Officer ("CFO") from November 2018 to September 2021.  Defendant Jones is named as a defendant in the Securities Class Action.  During the Relevant Period, Defendant Jones sold $4,457,343 of stock on insider knowledge.

34.     **Defendant Patricia Moran** ("Moran") has served as the Company's Chief Legal Officer ("CLO") and Secretary since January 2019.  During the Relevant Period, Defendant Moran sold $3,753,648 of Company stock on insider knowledge.

35.     **Defendant Mark E. Roszkowski** ("Roszkowski") has served as the Company's Chief Revenue Officer ("CRO") since February 2019.  During the Relevant Period, Defendant Roszkowski sold $2,108,241 of Company stock on insider knowledge.

36.     The Director Defendants and Defendants Jones, Moran and Roszkowski are collectively referred to herein as "Defendants".

## THE COMPANY'S CORPORATE GOVERNANCE

37.     As members of Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

38.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vroom, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

## DUTIES OF THE DIRECTOR DEFENDANTS

39.     By reason of their positions as officers, directors, and/or fiduciaries of Vroom and because of their ability to control the business and corporate affairs of Vroom, the Director Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good

faith and due care, and were and are required to use their utmost ability to control and manage Vroom in a fair, just, honest, and equitable manner.  The Director Defendants were and are required to act in furtherance of the best interests of Vroom and its shareholders.

40.    Each director and officer of the Company owes to Vroom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

41.    The Director Defendants, because of their positions of control and authority as directors and/or officers of Vroom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Vroom, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Vroom.

42.    To discharge their duties, the officers and directors of Vroom were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Vroom were required to, among other things:

        (a)    Ensure that the Company complied with its legal obligations and

requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     Conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     Remain informed as to how Vroom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     Ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

43.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vroom, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

44.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*. The Director Defendants' subjected the Company to the costs of defending, and the potential liability from, the securities class action. As a result, Vroom has expended, and will continue to expend, significant sums of money.

45.     The Director Defendants' actions have irreparably damaged the Company's corporate image and goodwill.

## **AUDIT COMMITTEE**

46.     The Audit Committee Charter charges the Audit Committee the following responsibilities:

> The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Vroom, Inc. (the "Company") in its oversight of the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company.

* * *

### **Duties and Responsibilities**

*Interaction with the Independent Auditor*

*Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the

14

Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit services, including but not limited to internal control-related services, and any non-audit services provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

* * *

_Financial Statements and Disclosures_

_Audit and Financial Reporting Problems_. The Committee must discuss separately with the independent auditor and management any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.

* * *

Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" for inclusion in the Company's Quarterly Report on Form 10-Q.

_Other Duties and Responsibilities_

_Review of Earnings Releases_. The Committee must review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

* * *

_Review of Code of Business Conduct and Ethics_. The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

## OVERVIEW OF THE COMPANY

47.     The Company has been in existence since 2013 when it was launched with Kevin Westfall and Marshall Chesrown as "Auto America."  In 2014, the Company hired Allon Bloch,

the prior co-CEO of wix.com, as CEO and Elie Wurtman as its executive chairman, and the Company transitioned into a technological platform and changed its name to Vroom.  In December 2015, Vroom acquired Texas Direct Auto Inc.

48.     Defendant Hennessy was appointed as the Company's CEO effective June 8, 2016, replacing Allon Bloch.  Defendant Hennessy had served as the CEO of priceline.com, after previously holding various positions within the Priceline organization.  At the same time that the Company announced Hennessy's appointment as CEO, it also announced that Defendant Robert J. Mylod, Jr., former CFO and Vice Chairman of The Priceline Group and a then-current Vroom board member, had been named Non-Executive Chairman of the Company's Board of Directors (the "Board").  Defendants Hennessy and Mylod had previously worked together at The Priceline Group for over a decade.

49.     The Company operates in three business segments: (1) Ecommerce, which represents retail sales of used vehicles through the Company's ecommerce platform; (2) Texas Direct Auto ("TDA"), which represents retail sales of used vehicles from the Company's physical location located in Stafford, Texas; and (3) Wholesale, which represents sales of used vehicles through wholesale auctions.  For the year ended December 31, 2020, the Company's Ecommerce segment accounted for 67.4% of the Company's revenues, while its Wholesale and TDA segments represented 18.1% and 14.5% of its total revenues, respectively.

## FACTUAL BACKGROUND

### The Company's "Asset-Light" Business Strategy

50.     Leading up to the Company's IPO, the Company promoted the so-called advantages of what it called its "asset-light" business strategy.  As a company heavily invested in technology, the Company avoided its need for ownership of assets in favor of a business model that relied

heavily on contracts with third-party service providers to assist in facilitating functions that would typically be controlled inhouse.

51.     In the IPO Offering Materials, the Company asserted its "asset-light strategy" was "fundamental to [its] business model" and reported that the Company's "future growth strategies [were] focused on developing [its] ecommerce business without the need for capital investment in physical retail locations."

52.     The Company described its asset-light strategy as a "combination of ownership and operation of assets by us with strategic third-party partnerships."  The Company claimed that this approach provided "flexibility, agility and speed . . . without taking on . . . unnecessary risk and capital investment," while also driving "improved unit economics and operating leverage."  The Company also stated that it applied this asset-light approach "to the third-party value-added products [it sold] to customers, which enable[d] [it] to generate additional revenue streams without taking on the risk associated with underwriting vehicle financing or protection products." By outsourcing portions of these functions of its business, the Company reported to the market that its asset-light business model reduced both risk and capital investment; thereby improving the Company's bottom line while at the same time reducing risk.

53.     Pursuant to this asset-light business strategy, the Company outsourced portions of its critical functions, including its: (i) reconditioning facilities, which performed reconditioning of vehicles in the Company's inventory to prepare them for sale; (ii) logistics operations, which handled delivery of the Company's cars in inventory to customers throughout the United States; (iii) customer financing, which provided vehicle financing to the Company's customers; and (iv) Customer Experience team, which operated the Company's primary call center and performed most every action necessary to consummate the sale of a car to a Company customer.  The

Company has represented that its "third-party customer experience center" handles "the substantial majority of inquiries, sales, purchases and financings of [its] vehicles in [its] ecommerce business," and even customers who wish to trade in a vehicle have to "interact with [Vroom's] customer experience team in order to complete their transaction."

54.     With respect to its outsourced "Customer Experience Team," the Company iformed the market that it had partnered with "a leading customer experience management provider" enabling the Company to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies."   While the Company represented that its Customer Experience was "partially dependent" on this third-party Customer Experience management provider over which it had "limited control," the Company's contract with that third-party provider told a different story.

**The Company's Customer Service Contract With Rock Connections LLC**

55.     In an August 22, 2017 press release entitled *Vroom Partners with Rock Connections to Drive Growth and Customer Experience*, the Company reported that it had partnered with a Detroit-based company called Rock Connections to handle its Customer Experience function.  In the press release, the Company described Rock Connections as a "strategic sales and marketing agency focused on outbound and inbound client service" and Defendant Hennessy claimed that "[b]y partnering with Rock Connections, [the Company could] ensure that [its] clients receive[d] immediate responses, while also providing the expert advice that Vroom customers demand." The press release stated:

> Car buyers and resellers no longer need to put their lives on hold to purchase or sell their cars. They can quickly and easily purchase a vehicle online and have it delivered anywhere in the United States. Conversely, sellers can have their car appraised online and arrange free pickup of their vehicle at a time that works for them. Rock Connections will provide sales and customer service support to both online and offline customers.

56.     The founder and chairman of Rock Connections was Dan Gilbert, also founder and chairman of Quicken Loans and majority owner of the NBA's Cleveland Cavaliers, who had been one of the Company's most high-profile investors since 2015.  The Company's press release stated that Gilbert had, at the time of the press release, recently invested in the Company's 2017 $76 million Series F round of funding that had raised the Company's total equity funding to $295 million since inception and leveraged Gilbert's prominence by including quotes from Gilbert himself in the press release.  Gilbert asserted that "[p]artnering with Vroom to help grow and support its exciting and unique model of purchasing cars online, with an experience that clearly feels much better than existing car purchasing methods, couldn't be a more perfect fit" for Rock Connections.  Rock Connections was a wholly owned subsidiary of Rocket Companies, Inc.

57.     The Company entered into a new "Customer Experience Management Agreement" for Rock Connections to handle the Company's Customer Experience function in April 2020 (the "2020 Customer Experience Agreement"), just two months before the Company's IPO.  The terms of that Agreement demonstrate that the Company had much more than "limited control" over the customer service provided to Company customers by Rock Connections.  Rather, the Agreement between the Company and Rock Connections, among other things: (1) mandated that Rock Connections provide all customer service in accordance with the Company's policies and procedures; (2) required that Rock Connections "enter and save all required information" in detail in the Company's CRM system, making it accessible to the Company's senior executives and management; (3) allowed the Company control over Rock Connections' staffing and training of staff; and (4) allowed the Company's executives access to monitor the customer support being provided to potential Company customers, including but not limited to monitoring capabilities for both voice and data with or without Rock Connections' knowledge, the allowance of onsite visits

19

by Company personnel to Rock Connections' facility, the provision of weekly reports to the Company, and a requirement for weekly meetings between representatives of Rock Connections and the Company.

58.     Both the Company and Rock Connections acknowledged that the purpose of the 2020 Customer Experience Agreement was "to maximize sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, and Direct Buys of vehicles from Customers, while providing to Customers the highest quality customer service and support." And to that end, under the terms of the Agreement, Rock Connections was tasked with providing a litany of "customer sales and support services," all of which were to be conducted in accordance with policies and procedures provided by the Company.  In addition to operating the Company's customer service call center, Rock Connections agreed to:

- Transfer calls to other operational teams at Vroom in accordance with Vroom's policies and procedures […];

- Send emails to Customers who have consented to receiving email communications from Vroom or in response to Leads in accordance with Vroom's Policies and Procedures;

- When and if implemented by Vroom pursuant to written instruction, send text messages to Customers to facilitate completion of a Transaction or in response to Leads, provided that the Customer has consented to receiving text messages from Vroom and Rock sends such texts only in accordance with Vroom's Policies and Procedures;

- When and if implemented by Vroom pursuant to written instruction, provide support via online chat messages to Customers to facilitate completion of a Transaction or in response to Leads in accordance with Vroom's Policies and Procedures;

- Assist Customers in selecting a Vehicle, understanding Vehicle features, obtaining credit pre-approval, completing a credit application, obtaining trade-in appraisals, understanding Vroom's limited warranty, understanding Value-Added Products […] and understanding Vroom's transaction terms, in each case, as may be requested by the Customer;

- Assist Customers who wish to sell their Vehicle to Vroom and are not trading in such Vehicle in connection with a Vehicle purchase ("Direct Buy") in obtaining an appraisal from Vroom. Any such Direct Buy Services shall be conducted by the Client Communication Specialist ("CCS") team at Rock in accordance with Vroom Policies and Procedures;

- For each Customer who chooses to purchase a Vehicle and has or obtains the requisite financing to do so, complete and email to such Customer a summary of the terms of the proposed transaction, including Vehicle price, financing terms, fees and taxes, Value-Added Products and trade-in value, in each case, as applicable ("Deal Summary") in a form mutually agreed by Vroom and Rock;

- Enter and save all required information in Vroom's customer relationship management ("CRM") system in accordance with Vroom's Policies and Procedures;

- Collect documentation from Customers that is needed to complete a Transaction, such as a driver's license, proof of insurance, and any requested loan stipulations;

- Ensure that the Deal Summary and documents collected from each Customer are saved appropriately in Vroom's CRM, change the stage of the Transaction in the CRM to "finalizing deal" for Quality Assurance Team review and, following such review, change the status of the Transaction in the CRM to "Contracting" so it can be picked up by the Vroom documentation team (or such other designations as Vroom may determine and communicate to Rock pursuant to written instruction); and

- Provide such other assistance and guidance to Customers as may be reasonably necessary to assist them in a Transaction.

59.    Importantly, as set forth above, the Agreement required that Rock Connections "enter and save all required information" in the Company's CRM system, including the ability to save documents in the system, edit the stage of each transaction in the system, and change the status of each transaction in the system.  As such, the Company's CRM system contained detailed information regarding each consumer transaction with the Company and any related customer service issues that were related thereto.

60.    The information contained in the Company's CRM system was granular, as evidenced by the fact that the 2020 Customer Experience Agreement also required that Rock

Connections "record 100% of the audio calls made in connection with the Services and ensure that all email and other written communications between Rock and a Customer are tracked and saved in Vroom's CRM database."[2]  The Agreement also required that Rock Connections "notify Vroom promptly in writing upon its receipt or knowledge of any complaint from any person, including a Customer, or entity regarding any Services provided [under the Agreement], and […] provide reasonable assistance in researching, investigating and responding to such complaints.

61.     Also, the 2020 Customer Experience Agreement required that Rock Connections "provide Vroom with the ability to access the recording system remotely vis Secure Internet access (https), as well as search for, listen to, and download contacts."

62.     The 2020 Customer Experience Agreement allowed Company management access to the CRM system and all of the information it contained for each Vroom transaction and customer service interaction, by customer.

63.     The 2020 Customer Experience Agreement also demonstrates the Company's control over Rock Connections' provision of customer service in other ways, including with respect to staffing.  For instance, the Agreement provided that Rock Connections and the Company would "create, mutually agree upon and maintain a staffing plan […] to adjust staffing levels for [customer service] Agents from time to time as needed."  As part of this staffing plan, Rock Connections and the Company would both "review hiring levels and needs on a rolling three-month basis […] and otherwise ensure adequate staffing of [customer service] Agents to provide the Services throughout the Term," with the parties also working together to develop a training program for these customer service agents.  The Company had the right to monitor this training

---

[2]     The 2020 Customer Experience Agreement mandated that Rock Connections "provide Vroom with the ability to access the recording system remotely vis Secure Internet access (https), as well as search for, listen to, and download contacts."

program, and the scripts developed and used by the customer service agents were to be "mutually develop[ed]" by the Company and Rock Connections, with the Company being "responsible for the compliance of all Scripts with applicable law and regulation."

64.    The Company also had unlimited access to monitor Rock Connections' communications and the customer service being provided to the Company's customers.  The 2020 Customer Experience Agreement also provided that Rock Connections would "provide Vroom with monitoring capabilities for both voice and data concerning Calls" and that the Company had "the right, as often as it desires, to monitor, without Rock's knowledge, the calls being performed by Rock on behalf of Vroom."  The Company was also authorized under the Agreement to "log into Rock's Five9 system (or any replacement system)" which allowed the Company "to view the current status of the team working on Vroom's account, run reports specific to the Services, or listen to recorded or real-time calls."  Rock Connections also agreed to provide access to the Company's representatives to be on site at the Rock Connections facility from time to time.

65.    The 2020 Customer Experience Agreement also mandated that representatives of Rock and the Company shall meet on a weekly basis, at times and locations to be agreed upon, to review reports and matters relevant to the transactions contemplated by this Agreement, including, without limitation, Rock's performance of the Services, sales by Vroom of Vehicles, trade-ins of Vehicles by Customers, sales by Vroom of Value-Added Products, the Staffing Plan, Cohort training and scripts.  Finally, Rock Connections was required to "transmit to Vroom weekly data and reports relating to the provision of the Services" under the Agreement "in a form to be mutually agreed by the Parties . . . ."[3]

---

[3]    In August 2020, Rock Connections assigned its responsibilities under the 2020 Customer Experience Agreement to Rocket Auto LLC ("Rocket Auto"), another wholly owned subsidiary of Rocket Companies, Inc., through an assignment again signed by Defendant Hennessy.  The

**Events Leading Up To The Company's IPO**

66.    Beginning in March 2020, the Company significantly reduced its used vehicle inventory in an effort to limit its exposure to an expected drop in demand as a result of the COVID-19 pandemic.  As Defendant Hennessy explained:

> [W]hen the COVID pandemic came to the United States, it was a very sobering time for us, as we have been in this game long enough to understand that aging inventory can be the death of a car retailer.  And yet in the early days of COVID, we saw a significant contraction in retail demand, which had ripple effects into the wholesale markets. ***Given the severity of the contraction and the extreme lack of visibility, we made the difficult decision to dramatically reduce our exposure to these alarming trends.***
>
> * * *
>
> […]  in late March and into the first half of the second quarter […] [w]e not only stopped buying new inventory, we methodically, dynamically and carefully price[d] our inventory to move very quickly.
>
> * * *
>
> At our peak in March, we were carrying over $200 million in inventory. At our low point in Q2, our inventory hit a low watermark of approximately $70 million […].

67.    The Company also reduced its employee headcount.  Defendant Hennessy has stated that because "[t]he wholesale markets underwent an alarming bout of instability and illiquidity, […]  we had to institute emergency furloughs and salary reductions."  The Company also disclosed that: "[e]ffective May 3, 2020, approximately one-third of [its] workforce was placed on furlough.  The majority of employees furloughed were in reconditioning, logistics, acquisitions and TDA sales, which were the positions most affected by the reduction in unit volume."

---

substance of the Agreement was unchanged, and Rocket Auto agreed to provide the services to the Company under the same terms as expressed in the Agreement, which was attached as an exhibit to the assignment.

68.     But any fears regarding the drop in used vehicle sales at the beginning of the pandemic dissipated moving into the summer of 2020.

69.     The Company sought to capitalize on this increase consumer demand for used vehicles beginning in May 2020 by building back inventory and taking steps to close its IPO.  An analyst report issued by Benchmark on June 9, 2020, reported that the timing could not have been better for Vroom, observing that:

> ***Timing is everything and the initial public offering of Vroom seems to have hit the target***…. Used vehicle sales in the US have recovered at a faster than expected pace, industry feedback suggests used vehicle prices have stabilized, and the virus related shutdown resulted in an expansion of selling vehicles on-line.

70.     In the offering materials for the IPO, Defendants portrayed the Company as well-positioned to capitalize on the booming market for used car sales and the consumer shift in favor of ecommerce because its Growth Flywheel would generate sales growth and its asset-light business approach would also reduce risk.  The IPO Offering Materials represented that the Company had been "strategically" building inventory for over a month that would "convert at target margins" and allow the Company to "ultimately exceed pre- COVID-19 levels":

> On April 20, 2020, we began to acquire new inventory, with a primary focus on high-demand models that we believe will convert at target margins. We intend to strategically build our inventory levels in the near term to return to and ultimately exceed pre-COVID-19 levels.

71.     The IPO Offering Materials noted that this increase in inventory was the first step in the Company's generation of increased sales growth through the use of the Company's Growth Flywheel:



72.     The Company promoted its so—called robust growth trajectory as being due to the various points on its Growth Flywheel.  As stated in the IPO Offering Materials:

> Our business has grown significantly as we have scaled our operations. ***Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion***. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage.

73.     The IPO Offering Materials further stated: "***[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel.***"

74.     With respect to the Customer Experience segment on the Growth Flywheel, the Company informed the market that Customer Experience was "fundamental to the growth of [its] business" and that the Company offered "[e]xceptional customer support," an "exceptional

customer experience," and an "exceptional ecommerce experience."  This, the Company stated was a primary consideration differentiating its offerings from those of "traditional auto dealers and the peer-to-peer market," representing that "*[o]ur professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed" and that "[i]n all of our customer interactions, our goal is to ensure that every customer is a delighted customer.*"  The Company also stated that "*[o]ur on-demand shopping and contact-free, convenient delivery* not only saves our customers a trip to the dealership, *it provides the ultimate driveway experience*."

75.     The IPO Offering Materials also assured investors that:

[A]t any point in the buying or selling process, our customers may encounter questions or challenges they are not equipped to or comfortable with resolving online. Our customer experience team provides human support to our customers in these situations. ***Our customer experience team handles customer questions about vehicle selection, financing, and the purchase or sale process. The team has been trained on our sale process and our core values of transparency and high customer satisfaction.***

76.     The IPO Offering Materials also contained a chart illustrating the Company's robust "Ecommerce Revenue" growth purportedly attributable to the Company's Growth Flywheel and the "[e]xceptional" Customer Experience it offered:



77.     With its "[e]xceptional" Customer Experience leading to increased conversion, sales growth and ecommerce revenue on the Company's Growth Flywheel, the Company informed the market that it was also reducing risk through its "asset-light" business model whereby it outsourced portions of its critical business functions, such as its Customer Experience function through the 2020 Customer Experience Agreement.

78.     The IPO Offering Materials also stated that its asset-light strategy was "fundamental to [its] business model," that it provided "flexibility, agility and speed […] without taking on […] unnecessary risk and capital investment" while also driving "improved unit economics and operating leverage," and that, given what it represented to be the benefits of this approach, this asset-light strategy was one of the Company's "Competitive Strengths."  The IPO Offering Materials also represented that the Company had "*partnered with a leading customer experience management provider to operate our primary call center*," which enabled the Company to "*centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies*."

28

79.     The IPO Offering Materials included as an exhibit the 2020 Customer Experience Agreement between Vroom and Rock Connections.  *The Company did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the IPO Offering Materials*. Indeed, Defendants sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm Vroom's business *in the future*:

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, could diminish consumer confidence in our platform and adversely affect our brand, *irrespective of their validity*. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. *If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels, it could materially and adversely affect our business, financial condition and results of operations*.

80.     Following the IPO, Defendants continued to represent to the market that the Company was well positioned to capitalize on a booming market for online used car sales.  For instance, on June 10, 2020, Defendant Hennessy conducted an interview with investor news site *TheStreet* in which he claimed that the Company was experiencing a surge in customer demand that created an "opportunity" to take the Company public earlier than previously anticipated. Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to consider purchasing a used vehicle online compared to three months previously, "so we really see the markets coming our way."

81.     On June 11, 2020, Defendant Hennessy had another interview with investor news site *TheStreet* in which he highlighted the market opportunity for the Company's products.

Defendant Hennessy represented that a shift to individual car ownership had been a "positive tailwind" for its business. Defendant Hennessy also claimed that with the "growth that we've had and now the continued tailwinds that we're seeing in our business, […] all I can say is that Vroom is in excellent position to […] enter […] the public markets […]." Defendant Hennessy also downplayed any concerns surrounding potential lingering adverse effects of the pandemic on the Company's business, representing that the Company's recent employee furloughs were "just about in our rearview window, and now we're back to work and scaling the business."

82.    Defendants also used the Company's 2020 second quarter earnings release and conference call with analysts and investors to promote the Company's market position and its purported ability to capitalize on increasing demand for online used car sales. For example, in an August 12, 2020 press release announcing its financial results for the second quarter of 2020 (the "2Q20 Release"), Defendant Hennessy misleadingly represented that it was lower inventory levels, rather than any issue with Vroom's Customer Experience function, that kept the Company from fulfilling increased consumer demand, and that Vroom's increasing inventory levels would solve that problem. Defendant Hennessy stated:

> I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment. During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. ***These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce***.

83.    The same day, on the Company's earnings call with analysts and investors to

discuss the Company's second quarter 2020 results, Defendants Hennessy and Jones continued to represent that more inventory for the Company would lead directly to more sales, and that any capacity restraints as a result of the Company's earlier sell-down of inventory in response to the pandemic had been resolved moving into the Company's third quarter.  Defendant Hennessy also stated that "[c]ontent begets [sales] conversion," and that the Company was in the midst of a "V-shaped recovery" where, after selling down its inventory in April 2020, the Company "[s]pent every day since May trying to build back [its] inventory" and had experienced "strong monthly sequential increases in unit sales in June and July."  Defendant Jones also stated that "despite lower average selling prices, we believe we will have ascending e-commerce gross profit per unit in the low to mid-single digits."  And later, Defendant Hennessy stated:

> *[W]e've got capacity […] lined up not only in Q3 to match our guidance*, but now and then I'd call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan.  *So we believe that we're almost out of this capacity constraint issue in this quarter*.

84.     Defendant Jones similarly responded: "[Y]ou had mentioned bottleneck [for vehicle reconditioning].  I think we're not currently experiencing any significant capacity constraints in any of those."

85.     Defendants' representations to the market that any capacity bottleneck limiting the Company's inventory originating from the early days of the pandemic had been resolved, and no other impediment would stop the Company from maximizing its ability to generate increased conversion on the Company's Growth Flywheel, had its intended effect as the Company's stock price rose in the wake of these disclosures.  The Company's stock climbed from its IPO price of $22.00 per share on June 9, 2020, to close at a class period high of $73.87 on September 1, 2020:

86.     Only one week later, on September 8, 2020, Defendants announced the September 2020 SPO and filed the SPO Registration Statement with the SEC.  J.P. Morgan noted in a

September 9, 2020 analyst report that Defendants acknowledged the September 2020 SPO was "opportunistic": "[Vroom] [m]anagement noted that the equity raise was opportunistic given the outperformance in [Vroom] shares since the IPO [...]."  Three days later, the Company filed the SPO Prospectus with the SEC.  The SPO Offering Materials repeated many of the same misrepresentations made by the Company in the IPO Offering Materials regarding the use of its Growth Flywheel to generate sales growth and its asset-light business approach to simultaneously reduce risk.

87.    In the SPO Offering Materials, Defendants touted the Company's growth attributable to its Growth Flywheel as well as its "[e]xceptional customer support," "exceptional customer experience," and "exceptional ecommerce experience" that the Company provided.[4] And, as in the IPO Offering Materials, the Company represented that its "professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed" and that "[i]n all of our customer interactions, our goal is to ensure that every customer is a delighted customer."  Also, the Company stated that "[o]ur on-demand shopping and contact-free, convenient delivery not only saves our customers a trip to the dealership, it provides the ultimate driveway experience."

88.    In the SPO Offering Materials, the Company stated that it was reducing risk through its "asset-light" business model wherein it outsourced portions of critical business functions, such as its Customer Experience function through its 2020 Customer Experience Agreement.  The Company characterized its asset-light strategy as "fundamental to [its] business model" and as one of the Company's "Competitive Strengths."  With respect to the outsourcing of the Company's

---

[4]    In fact, Vroom made reference to its "exceptional" customer support and experience, in various iterations, no less than 30 times throughout the SPO Offering Materials.

Customer Experience team, the SPO Offering Materials again represented that the Company had "partnered with a leading customer experience management provider to operate our primary call center," which enabled the Company to "centralize [its] contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies."

89.     In contrast to the IPO Offering Materials, the SPO Offering Materials referenced the BBB in the context of a purported risk disclosure about the possible impact of consumer complaints on the Company's business.  However, the Company did not disclose that its BBB accreditation had been revoked or any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function pursuant to the 2020 Customer Experience Agreement in the SPO Offering Materials.

90.     Defendants again sought to portray any negative complaints about the Company as "misinformation" that needed to be "correct[ed]" or "mitigate[d]" and that could theoretically only harm the Company's business in the future.

91.     On September 8, 2020, the Company filed with the SEC a current report on Form 8-K (the "September 8, 2020 Form 8-K").  In the September 8, 2020 Form 8-K, Defendants told investors that the Company's post-pandemic build-up of inventory was translating to continued growth in ecommerce units sold, portraying the Company's Growth Flywheel as churning out higher sales conversion than ever, and as such that the Company was making substantial positive adjustments to the third quarter 2020 guidance it had issued only a month earlier.  The September 8, 2020 Form 8-K stated:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and ***we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, we have experienced continued growth in ecommerce units sold. As well, the increase in demand combined with continuing supply constraints in the broader market has led to***

*better than expected improvements in our gross profit per unit. As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic. Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as follows*:

•      Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).

* * *

•      Total revenue of $290 million – $310 million (from $268 million – $290 million).

•      Total gross profit of $21 million – $23 million (from $16 million – $18 million).

•      Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).

92.     Contrary to all of Defendants' statements above, the Company's Customer Experience segment on its Growth Flywheel was not working and had been for some time leading up to the Company's IPO. The Company's Customer Experience had been in a downward spiral beginning as early as January 2020, over five months before the Company's IPO and over eight months before the September 2020 SPO.

**BBB's Board Of Directors Revoke The Company's Accreditation**

93.     The BBB has stated that "[b]eginning in January 2020, [it] began receiving complaints and customer reviews [about Vroom] which exhibited several different patterns," including complaints from Vroom customers asserting that: (1) "the vehicle[] they purchased from photos was not the vehicle they received;" (2) "[w]hen the vehicle was received it had either body damage, interior was dirty, discolored or damaged or all of the above;" (3) damaged "cars were delivered at night, so damages were not noticed at delivery;" and (4) "cars were left in a parking

34

lot or driveway at night with the keys left in them."[5]  Further, "[c]onsumers also stated they were having customer service and communication issues when trying to reach out to the company to address their concerns" and "were not receiving the necessary paperwork to get their car registered," were experiencing "delayed delivery in receiving their car," and/or were experiencing "issues concerning their trade-in."[6]

94.     The BBB has further found that "[s]ince January [2020], the pattern of [Vroom] complaints has not trended down but has actually increased," with "new patterns of complaints" in June 2020 focused on "warranty issues, deceptive Carfax issues and/or wrecked cars being sold."[7]  More recent complaints in 2021 focus on Vroom's third-party delivery drivers being "rude and threatening," consumers "being switched around to different [customer service] departments but […] not receiving any assistance," and consumers' "insurance companies […] dropping coverage" due to "delays in getting their registration documents" from Vroom.[8]

95.     Based on the overwhelming multitude and type of customer service issues being reported to the BBB, the BBB initiated proceedings to revoke the Company's BBB accreditation. The BBB notified the Company that its accreditation was suspended and was undergoing review for possible revocation.  The BBB has a process by which a business may appeal an impending revocation to the BBB Membership Committee.  The Membership Committee then votes on any appeal, and its decision is then sent to the BBB Board of Directors for a final vote.

96.     On September 2, 2020, just before the Company announced its Secondary Offering, the BBB Board of Directors revoked Vroom's accreditation due to its failures to adhere to and

---

[5]      https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633, accessed April 27, 2022.
[6]      *Id.*
[7]      *Id.*
[8]      *Id.*

abide by BBB standards, including but not limited to, the Company's failure to (a) "honestly represent products and services, including clear and prominent disclosures of all material terms;" (b) "[a]ddress disputes forwarded by BBB quickly and in good faith;" (c) "[a]pproach all business dealings, marketplace transactions and commitments with integrity, good faith and intent to do what is reasonably expected;" and (d) "[c]ooperate with BBB in efforts to eliminate the underlying cause of patterns of customer complaints that are identified by BBB."[9]

97.     Despite this trend of increasing consumer complaints about the Company's Customer Experience, the Company did not disclose in the IPO Offering Materials or the SPO Offering Materials any then-occurring adverse issues or trends related to either its Customer Experience function or its outsourcing of that function pursuant to the 2020 Customer Experience Agreement.  Nor did the Company disclose the revocation of its BBB accreditation in the SPO Offering Materials.  Further, Defendants misrepresented and/or failed to disclose that: (1) Vroom's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (2) Vroom's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities; (3) as a result of (1)-(3) above, Vroom needed to invest tens of millions of dollars in bolstering its sales and support and logistics networks, materially impairing the Company's short term profitability; and (4) as a result of (1)-(3) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust online used car market.

**Vroom's Customer Experience Issues Directly Impact The Company's Financial Prospects**

---

[9]      https://www.bbb.org/us/tx/stafford/profile/used-car-dealers/vroom-0915-90044633, accessed April 27, 2022.

98.     Regarding revenue recognition, the Company stated in its SEC Form 10-K for the year-ended December 31, 2020, filed with the SEC on March 3, 2021 (the "2020 Form 10-K"), that it "recognizes revenue upon transfer of control of goods or services to customers, in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services."  With respect to its retail vehicle revenue (vehicles sold to customers through its ecommerce platform and TDA retail location), the Company contends that it "satisfies its performance obligation and recognizes revenue for used vehicle sales generally at a point in time when the vehicles are delivered to the customer for ecommerce sales or picked up by the customer for TDA sales."  Thus, the Company is unable to recognize revenue from sales where consumers do not receive the car they purchased or are experiencing "delayed delivery in receiving their car," and could also be unable to recognize revenue where consumers are experiencing "issues concerning their trade-in," which are all issues identified by the BBB as subjects of increased complaints beginning in January 2020.

99.     On November 11, 2020, the Company issued a release announcing its third quarter 2020 financial results (the "3Q20 Release").  The 3Q20 Release included a "Financial Outlook" for the Company's fourth quarter of 2020 stating that the Company expected to suffer higher losses moving forward.  The Company informed the market that its adjusted EBITDA losses were projected to increase from $36 million in the third quarter of 2020 to a loss range of $44 million to $52 million for the Company's fourth quarter, a 33% sequential increase at the midpoint.  During the Company's accompanying earnings call, Defendants stated that the Company was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks in order to avoid constrained growth, despite the favorable market environment.

100.    However, Defendants insisted that the Company was well-positioned to achieve fourth quarter guidance metrics contained in the 3Q20 Release.  As Defendant Hennessy stated:

> As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance.  We just put guidance out there to give you really good insight based on everything that we're seeing thus far.  And I think feel great about the numbers that [CFO Jones] talked about in terms of e-commerce growth on a year-over-year basis. It's just -- it's strong.  So we're feeling really good.

101.    Defendant Hennessy also again informed the market that "increased inventory driv[ing] increased demand and increased conversion."  And with respect to the "bottleneck" in the Customer Experience segment of the Company's Growth Flywheel, CEO Hennessy assured the market that Defendants were "working through the backlogs of things," were "very-very focused on getting the customer experience right," and would have the issue "rectified in Q4."

102.    On this news the price of Vroom stock fell $5.31 per share, or 13%, from a close of $40.80 per share on November 11, 2020 to a close of $35.49 per share on November 12, 2020.

103.    Then, on March 3, 2021, the Company issued a release reporting its fourth quarter and full year financial results (the "4Q20 Release").  The 4Q20 Release revealed operational issues and financial results far worse than previously disclosed to investors.  The Company's fourth quarter financial results disappointed in a number of areas, with the Company suffering a net loss of $60.7 million, a 42% year-over-year increase, representing a loss per share 20% worse than the midpoint of Defendants' prior guidance.  The Company's fourth quarter EBITDA loss and total gross profit per unit also missed the range provided by Defendants in November, when Defendant Hennessy stated that they were "feeling really good" and provided guidance to give investors "really good insight."

104.    During the Company's accompanying earnings call held the same day, Defendant Hennessy stated that the Company was suffering from severe sales backlogs due to inadequate

sales and support staff, which had materially impaired the Company's ability to sell existing inventory. These backlogs, along with a degraded Customer Experience, had constrained the Company's business and forced it to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable market for online used car sales. Also, Defendant Hennessy admitted that these deficiencies would continue to constrain the Company's profits into the first quarter of 2021, stating: "we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1."

105.    On this news, the price of the Company stock dropped $12.29 per share, or 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

106.    Defendants portrayed the Company as a growth company that was well-positioned to take advantage of a market for online used car sales thanks to the ever-increasing momentum of its Growth Flywheel.  The Company represented to the market that it was building its inventory to take advantage of historically high demand for online used car sales, and that this higher inventory combined with the "exceptional" Customer Experience it offered would translate directly to increased sales conversion on the Growth Flywheel.  Also, the Company touted the purported advantages of its "asset-light" business strategy, whereby the Company largely outsourced many critical business functions of the Company, including its Customer Experience function, as a means for the Company to generate larger financial results while reducing both risk and capital investment.

**The Company's IPO Offering Materials**

107.    On June 9, 2020, the Company filed a prospectus that incorporated and formed part of the registration statement for its IPO.  With respect to the Company's ability to drive growth, Defendants promoted the COmpany's Growth Flywheel in the IPO Offering Materials, stating:

> Our business has grown significantly as we have scaled our operations. ***Our growth is not attributable to a single innovation or breakthrough, but to coalescence around multiple strategies that serve as points on our flywheel. The diversity and number of vehicles in our inventory drive demand and support expanded national marketing to enable us to acquire new customers more cost effectively, allowing us to invest back into our platform to continue to improve the customer experience, all of which drives increased conversion. This flywheel revolves, builds momentum and ultimately propels our business forward as we seek to drive disciplined growth and operating leverage***.

**Growth Flywheel**



108.    As Defendants explained, "***[s]ales conversion drives revenue growth and is an output of the acceleration of every point on the growth flywheel***."

109.    In the IPO Offering Materials, Defendants also stated that "[t]he quality of the customer experience on [Vroom's] ecommerce platform is critical to [its] ability to attract new visitors to [its] platform, convert such visitors into customers and increase repeat customers." Defendants also stated in the IPO Offering Materials that they were "***deeply committed to creating an exceptional experience for our customers***."  To emphasize this commitment, Defendants repeatedly represented throughout the IPO Offering Materials that the Company provided "***[e]xceptional customer support***," an "***exceptional customer experience***," and an "***exceptional ecommerce experience***."  As part of the exceptional Customer Experience it offered, the Company stated that "***[o]ur professional customer experience team accompanies the buyer through every step of the process to make sure all questions are answered and any concerns are addressed.  In all of our customer interactions, our goal is to ensure that every customer is a delighted customer.***"

110.    Defendants stated that this high-quality Customer Experience purportedly set  the Company apart from "traditional auto dealers and the peer-to-peer market," claiming in the IPO Offering Materials that the Company was able to bring "***together all phases of the vehicle buying and selling process in a seamless, intuitive and convenient way***" and "***create a climate of trust***" through "***an exceptional experience with complete transparency***" that eliminates "friction and sales pressure."  Based on the "exceptional" Customer Experience it purportedly provided as a key component of its Growth Flywheel, the Company stated that in April 2020 it had begun "to acquire new inventory from both auctions and consumers, with a primary focus on high-demand models that ***we believe will convert at target margins***."  The Company stated that this increase in inventory would enable the Company "***to take advantage of [its] position and value proposition in the used automotive market***."

111.    With respect to the Company's "asset-light" business approach, the Company stated in the IPO Offering Materials that it took "a vertically integrated, asset-light approach that is reinventing all phases of the vehicle buying and selling process, from discovery to delivery and everything in between."  The Company described this asset-light approach as "a hybrid approach across [its] business combining ownership and operation of assets [...] with strategic third-party partnerships" that provided "flexibility, agility and speed as [Vroom] scale[d] [its] business [...] without taking on the unnecessary risk and capital investment inherent in direct investment." Vroom characterized its asset-light business strategy as "fundamental to [its] business model" and as one of its "Competitive Strengths."

112.    In the IPO Offering Materials, the Company stated that it employed this hybrid asset-light approach across several areas of its business, including with respect to "customer experience."  The Company represented that its asset-light approach to its "Customer Experience Team" allowed it to "ensure consistency in customer interactions, increase conversion and maximize operating efficiencies," as follows:

> [i]n addition to our in-house customer support personnel, *we have partnered with a leading customer experience management provider to operate our primary call center. This strategy enables us to centralize our contact center services, ensure consistency in customer interactions, increase conversion and maximize operating efficiencies.*

113.    The Company further represented that where "customers [...] encounter questions or challenges they are not equipped to or comfortable with resolving online," the Company's Customer Experience team "provides human support to [its] customers in these situations," handling "customer questions about vehicle selection, financing, and the purchase or sale process." The Company told investors that its Customer Experience team "has been trained on our sale process and our core values of transparency and high customer satisfaction." The IPO Offering

Materials included as an exhibit the 2020 Customer Experience Agreement between the Company and Rock Connections that was signed by Defendant Hennessy.

114.    In the IPO Offering Materials, the Company did not disclose any then-occurring adverse issues or trends related to either (1) its Customer Experience function or (2) its outsourcing of that function as part of its asset-light business strategy.  Rather, as part of the "Risk Factors" included in the IPO Offering Materials, the Company portrayed any potential problems with its Customer Experience function as purely theoretical, and in any event as issues that could only harm the Company's business in the future.  For instance, with respect to the outsourcing of its Customer Experience function to Rock Connections (which the Company described as a "third party"), the Company stated:

> Currently, the substantial majority of inquiries, sales, purchases and financings of our vehicles in our ecommerce business are conducted through a third-party customer experience center located in Detroit, Michigan, and customers who wish to trade in a vehicle currently must interact with our customer experience team in order to complete their transaction. Thus, *the customer experience center is fundamental to the success of our business*. As a result, the success of our business and our customer experience is partially dependent on a third party over which we have limited control. *If* the third party's systems and operations fail or *if* the third party is otherwise unable to perform its sales function, *we may be unable* to complete customer transactions, which *would* prevent us from selling vehicles and value-added products through our platform.  In addition, *if* such third party is unable to perform to our standards or to provide the level of service required or expected by our customers, or we are unable to renegotiate the agreement with the third party on attractive terms or at all, or *if* we are unable to contract with an alternative third party provider, our business, financial condition and results of operations may be harmed and *we may be* forced to pursue alternatives to provide these services, which *could result* in delays, interruptions, additional expenses and loss of potential and existing customers and related revenues.

115.    With respect to the quality of Customer Experience provided, the Company similarly characterized any issues as theoretical at the time of the IPO, and as issues that could only harm the Company's business in the future.  Further, rather than acknowledge the validity of any complaints about the Company's Customer Experience, the Company portrayed any negative

complaints about its Customer Experience as "misinformation" that needed to be "correct[ed]" or "mitigate[d]," as follows:

> Our business model is primarily based on our ability to enable consumers to buy and sell used vehicles through our ecommerce platform in a seamless, transparent and hassle-free transaction. *If* consumers fail to perceive us as a trusted brand with a strong reputation and high standards, or *if* an event occurs that damages our reputation, it *could* adversely affect customer demand and have a material adverse effect on our business, revenues and results of operations. Even the perception of a decrease in the quality of our customer experience or brand *could* impact results. Our high rate of growth makes maintaining the quality of our customer experience more difficult.

> Complaints or negative publicity about our business practices, marketing and advertising campaigns, vehicle quality, compliance with applicable laws and regulations, data privacy and security or other aspects of our business, especially on blogs and social media websites, *could* diminish consumer confidence in our platform and adversely affect our brand, *irrespective of their validity*. The growing use of social media increases the speed with which information and opinions can be shared and thus the speed with which our reputation can be damaged. *If we fail to correct or mitigate misinformation or negative information about us, our platform, our vehicle inventory, our customer experience, our brand or any aspect of our business, including information spread through social media or traditional media channels*, it *could* materially and adversely affect our business, financial condition and results of operations.

116.    Defendants' representations in the IPO Offering Materials were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (1) the Company's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (2) as a result of this degraded Customer Experience and lost sales opportunities, the Company needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (3) as a result of (1)-(2) above, Vroom was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, the Company was actually in no position to take advantage of a thriving market for online used car sales.

**Defendant Hennessy's Post-IPO Interviews**

117.    Immediately following the Company's IPO, Defendant Hennessy conducted two interviews with investor news site *TheStreet*, wherein he emphasized that the Company was positioned to capitalize on the booming market for online used car sales.  In the first interview, conducted on June 10, 2020, Defendant Hennessy claimed that the Company was experiencing a surge in customer demand that created an "opportunity" to take the Company public earlier than previously anticipated.  Defendant Hennessy stated that the online used car market had "stabilized" and customers were now "twice as likely" to consider purchasing a used vehicle online compared to three months previously.  As such, Defendant Hennessy told investors that "we really see the markets coming [Vroom's] way."

118.    Then, on June 11, 2020, Defendant Hennessy conducted another interview with *TheStreet*, highlighting the purported massive market opportunity for the Company's products. Defendant Hennessy told investors that a shift to individual car ownership had been a "positive tailwind" for the Company's business, and represented that with the "growth that we've had and now the continued tailwinds that we're seeing in our business, […] all I can say is that Vroom is in excellent position to […] enter […] the public markets […]."  In this June 11, 2020 interview, Defendant Hennessy also sought to downplay any concerns surrounding potential lingering adverse effects of the pandemic on the Company's business, representing that the Company's recent employee furloughs were "just about in our rearview window, and now we're back to work and scaling the business."

119.    Defendant Hennessy's representations in his June 10 and June 11, 2020 interviews with *TheStreet* were materially false and misleading because he misrepresented and/or failed to disclose that: (1) the Company's lack of adequate sales and support staff had resulted in a degraded

Customer Experience and lost sales opportunities, as set forth herein; (2) as a result of this degraded Customer Experience and lost sales opportunities, the Company needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (3) as a result of (1)-(2) above, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendant Hennessy's representations in the interviews, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

**Second Quarter 2020 Financial Results**

120.   On August 12, 2020, the Company filed a Form 8-K and attached 2Q20 Release with the SEC, reporting the Company's financial results for its second quarter of 2020.  In the 2Q20 Release, Defendant Hennessy again promoted the Company's market position and its ability to grow by capitalizing on increasing demand for online used car sales through an increase in inventory.  Defendant Hennessy stated:

> I am pleased with our results for the second quarter, in which we performed substantially ahead of our growth plan, and I am encouraged by both the continued validation of the Vroom model and the performance of our employees in a tough environment. During the course of this single quarter, we managed through significant swings in demand and numerous operational challenges brought on by the COVID-19 pandemic. In response to the drop in demand and uncertainty around vehicle pricing early in the pandemic, we chose to de-risk the business by significantly reducing our inventory during the first half of the quarter. ***As demand increased and pricing became more stable through the second half of the quarter, we pivoted to start rebuilding inventory and continue to do so. These lower inventory levels prevented us from fulfilling all of the demand that materialized in the second half of the quarter. We believe we continue to be well positioned to navigate the challenges presented by the COVID-19 crisis and take advantage of shifting consumer buying and selling patterns in favor of ecommerce***.

121.   Later that day, the Company hosted a conference call with analysts and investors to discuss the Company's second quarter 2020 financial results, where Defendants Hennessy and Jones continued to represent to the market that more inventory, or capacity, for the Company

would lead directly to more sales, or revenue, and that any capacity restraints as a result of the Company's earlier sell-down of inventory in response to the pandemic had been resolved moving into the Company's third quarter.  Defendant Hennessy explained during the call that "[c]ontent begets [sales] conversion," and that the Company was in the midst of a "V-shaped recovery" where, after selling down its inventory in April 2020, the Company "spen[t] every day since May trying to build back [its] inventory" and had experienced "strong monthly sequential increases in unit sales in June and July."  In response to an analyst question, Defendant Hennessy stated:

> *[W]e've got capacity…lined up not only in Q3 to match our guidance*, but now and then, I call a catch-up period that allows us to continue on our scaled ramp in conjunction with our long-range plan. *So we believe that we're almost out of this capacity constraint issue in this quarter.*

122.    Defendant Jones also stressed on the call that "[w]e're confident that we can currently have the capacity to meet our Q3 targets, and we believe our utilization will continue to increase and we work with our reconditioning partners to continue expanding our reconditioning network."  In response to an analyst question concerning any capacity bottleneck due to reconditioning of used vehicles to prepare them for sale, Defendant Jones represented that Vroom was "not currently experiencing any significant capacity constraints" in that area.

123.    In the Company's accompanying Form 10-Q (the "2Q20 Form 10-Q"), Defendants made representations similar to the representations they made in the IPO Offering Documents regarding the Company's Customer Experience and asset-light business strategy.  Defendants represented that they were "deeply committed to creating an exceptional experience for [Vroom's] customers" and that Vroom "offer[ed] an exceptional ecommerce experience for [its] customers." Further, Vroom stated that its asset-light business strategy "optimizes a combination of ownership and operation of assets by [Vroom] with strategic third-party partnerships."

124.    Defendants' representations in reporting the Company's second quarter 2020

financial results were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (1) the Company's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (2) the Company's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (3) as a result of (1)-(2) above, the Company needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (4) as a result of (1)-(3) above, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales. As such, contrary to Defendants' representations, Vroom was actually in no position to take advantage of a thriving market for online used car sales.

**September 2020 SPO Offering Materials**

125.   The SPO Offering Materials, including the SPO Registration Statement filed on September 8, 2020, and the SPO Prospectus filed on September 11, 2020, contained many false and misleading statements, and omitted to state other material facts, relating to the Company's Customer Experience, asset-light business strategy, and position to capitalize on a thriving market for online used car sales. Certain Defendants that signed the SPO Offering Materials and/or controlled the statements made in the SPO Offering Materials misrepresented and/or failed to disclose that: (1) the Company's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (2) the Company's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (3) as a result of (1)-(2) above, the Company needed to

invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short-term profitability; and (4) as a result of (1)-(3) above, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  Contrary to Defendants' representations, the Company was actually in no position to take advantage of a thriving market for online used car sales.  Further, the SPO Offering Materials represented that consumer complaints on platforms such as the BBB "could" diminish consumer confidence in the Company, while failing to disclose that the BBB had initiated proceedings to revoke the Company's BBB accreditation and had done so by a vote of the BBB Board of Directors on September 2, 2020.

**The September 8, 2020 Form 8-K**

126.    On September 8, 2020, the Company filed with the SEC a current report on Form 8-K providing an update on its operational and financial results intended to spur purchases of shares in the September 2020 SPO closing only a few days later.  In the September 8, 2020 Form 8-K, Defendants told investors that the Company's post pandemic build-up of inventory was translating to continued growth in ecommerce units sold, portraying the Company's Growth Flywheel as churning out higher sales conversion than ever, and as such that the Company was making substantial positive adjustments to the third quarter 2020 guidance it had issued only a month earlier.  The September 8, 2020 Form 8-K stated:

> Our inventory strategy is designed to take advantage of what we believe are structural shifts in consumer behavior and increased demand for the Vroom model, and we have continued to scale our inventory levels in the third quarter of 2020. As higher inventory levels lead to higher conversion, ***we have experienced continued growth in ecommerce units sold. As well, the increase in demand combined with continuing supply constraints in the broader market has led to better than expected improvements in our gross profit per unit. As of the date of this report, we have seen our results continue to improve after the disruptions in the early stages of the COVID-19 pandemic. Accordingly, we are updating the guidance we provided with our second quarter earnings release for Q3 2020 as***

*follows:*

- Ecommerce unit sales of 8,700 – 8,900 (from 8,500 – 8,800), average total revenue per unit of $24,500 (from $23,500) and average gross profit per unit of $1,850 – $1,950 (from $1,600 – $1,700).

\* \* \*

- Total revenue of $290 million – $310 million (from $268 million – $290 million).

- Total gross profit of $21 million – $23 million (from $16 million – $18 million).

- Net loss per share of $(0.40) – $(0.36) (from $(0.42) – $(0.37)).

127.   Defendants' representations in the September 8, 2020 Form 8-K were materially false and misleading because Defendants misrepresented and/or failed to disclose that: (1) the Company's inventory growth had far outpaced the capabilities of its existing sales and support personnel, creating a logistical bottleneck that threatened the Company's profits, the value of its existing inventory and its ability to achieve positive cash flows; (2) the Company's lack of adequate sales and support staff had resulted in a degraded Customer Experience and lost sales opportunities, as set forth herein; (3) as a result of (1)-(2) above, the Company needed to invest tens of millions of dollars in bolstering its sales and support logistics networks, materially impairing the Company's short term profitability; and (4) as a result of (1)-(3) above, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.  As such, contrary to Defendants' representations, the Company was actually in no position to take advantage of a thriving market for online used car sales.

## THE GRADUAL EMERGENCE OF THE FULL SCOPE OF THE FRAUD

128.   The truth about the Company's Customer Experience and asset-light business strategy was revealed in two corrective disclosures.

129.    On November 11, 2020, the Company issued the 3Q20 Release, reporting that it expected to suffer sharply higher losses in the fourth quarter of 2020 with adjusted EBITDA losses projected to increase from $36 million in the third quarter of 2020 to a loss range of $44 million to $52 million for the Company's fourth quarter, a 33% sequential increase at the midpoint.  During the Company's accompanying earnings call held the same day, Defendants revealed that the Company was suffering from a "bottleneck" in its sales support and needed to invest heavily in building out the Company's sales support and logistics networks in order to avoid constrained growth, despite the favorable market environment.

130.    However, Defendants continued to mislead investors concerning the negative impact the Company's Customer Experience was having on the Company's ability to capitalize on a booming market for online used car sales, insisting that the Company was well-positioned to achieve fourth quarter guidance metrics contained in the 3Q20 Release.  As Defendant Hennessy stated on the Company's third quarter 2020 earnings call:

> As far as how are we doing intra-quarter, I guess what I'd say is I stand by our guidance. We just put guidance out there to give you really good insight based on everything that we're seeing thus far. And I think feel great about the numbers that [CFO Jones] talked about in terms of e-commerce growth on a year-over-year basis. It's just – it's strong. So we're feeling really good.

131.    Defendant Hennessy also stated that the Company's Growth Flywheel "increased inventory driv[ing] increased demand and increased conversion."   And with respect to the "bottleneck" in the Customer Experience, Defendant Hennessy assured the market that Defendants were "working through the backlogs of things," were "very-very focused on getting the customer experience right," and would have the issue "rectified in Q4."

132.    In the Company's accompanying Form 10-Q (the "3Q20 Form 10-Q"), Defendants made representations similar to the representations they made in the IPO Offering Materials and

SPO Offering Materials regarding the Company's Customer Experience and asset-light business strategy. Defendants represented that they were "deeply committed to creating an exceptional experience for [Vroom's] customers" and that the Company "offer[ed] an exceptional ecommerce experience for [its] customers." Also, the Company stated that its asset-light business strategy "optimizes a combination of ownership and operation of assets by [Vroom] with strategic third-party partnerships."

133.    Defendants' representations in reporting the Company's third quarter 2020 financial results were materially false and misleading because Defendants misrepresented and/or failed to disclose that, contrary to increased inventory driving increased demand and sales conversion, the Company's increased inventory was only exacerbating a bottleneck in Vroom's Customer Experience caused by a lack of adequate sales and support staff that was resulting in a degraded Customer Experience and lost sales opportunities. Further, unbeknownst to the market, this issue had existed at the Company from as early as January 2020 and could not be rectified in a single quarter. Rather, due to this bottleneck in the Customer Experience spoke of its Growth Flywheel, the Company was poised to suffer accelerating losses and increased negative cash flows, despite a robust market for online used car sales.

134.    On this news the price of Company stock fell $5.31 per share, or 13%, from a close of $40.80 per share on November 11, 2020 to a close of $35.49 per share on November 12, 2020.

135.    On March 3, 2021, the Company issued the 4Q20 Release, revealing operational issues and financial results far worse than previously disclosed to investors. The Company's fourth financial results disappointed in a number of areas, including the Company suffering a net loss of $60.7 million, a 42% year-over-year increase, representing a loss per share 20% worse than the midpoint of Defendants' prior guidance.

136.    During the Company's accompanying earnings call held the same day, Defendant Hennessy indicated that the Company was suffering from severe sales backlogs due to inadequate sales and support staff, which had materially impaired the Company's ability to sell existing inventory.   These backlogs, along with a degraded Customer Experience, had operationally constrained the Company's business and forced the Company to liquidate aging inventory at fire sale prices for a significantly reduced profit or even at a loss, despite a historically favorable market for online used car sales.  Defendant Hennessy also admitted that these deficiencies would continue to constrain the Company's profits into the first quarter of 2021, stating: "we bought more inventory than we could actually process and that excess inventory needed to be moved in Q4, and will continue to be moved in Q1."

137.    On this news, the price of Company stock plummeted $12.29 per share, or 28%, from a close of $43.90 per share on March 3, 2021, to a close of $31.61 per share on March 4, 2021.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of Defendants' violations of Section 20(a) of the Exchange Act, and their breaches of fiduciary duties and other wrongful conduct as alleged herein and that occurred during the Relevant Period.

147.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

148.    Plaintiff is a current owner of the Company stock and has been an owner of Company stock during the Relevant Period.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

149.    Because of the facts set forth herein, Plaintiff has not made a demand on the Board of the Company to institute this action against the Director Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

150.    At the time this suit was filed, the Board was comprised of six (6) members -- Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy.  Thus, Plaintiff is required to show that a majority of Defendants, *i.e.*, three (3), could not exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

151.    The Director Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Director Defendants had knowledge of material non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

152.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

153.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this

Complaint, Plaintiff did not make (and was excused from making) a pre-filing demand on the Board to initiate this action because making a demand would have been a futile and useless act.

154.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

155.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

156.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT**

157.    Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy all face a substantial likelihood of liability for their individual misconduct.  Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

158.    Moreover, Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy, as directors owed a duty to, in good faith and with due diligence, exercise

reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care. Instead, they reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

159.   Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy knowingly and consciously allowing the authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy face a substantial likelihood of liability. If Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy were to bring a suit on behalf of Vroom to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability. This is something they will not do.  For this reason, demand is futile as to Defendants Hennessy, Mylod, Dahnke, Farello, Lang, and O'Shaughnessy.

**Defendant Hennessey**

160.   Defendant Hennessey is the Company's CEO.   Defendant Hennessey is not disinterested or independent, and therefore, is incapable of considering demand because Defendant Hennessey (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  For compensation in this

position, for the fiscal year ended December 31, 2020, he received $4,315,077 in total compensation from the Company. As such, Defendant Hennessey could not independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would have exposed him to liability and threaten his livelihood.

161.     This lack of independence and financial benefits received by Defendant Hennessey renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

162.     Further, Defendant Hennessey is also a defendant in the Securities Class Action.

**Defendants Hennessey and Mylod**

163.     Defendant Hennessy was appointed as the Company's CEO effective June 8, 2016, and Defendant Hennessy had served previously served as the CEO of priceline.com, an operating business of The Priceline Group, after previously holding various positions within the Priceline organization.  At the same time that the Company announced Hennessy's appointment as CEO, the Company also announced that Defendant Mylod, former CFO and Vice Chairman of The Priceline Group and a then-current Vroom board member, had been named Non-Executive Chairman of the Vroom Board of Directors. Defendants Hennessy and Mylod had previously worked together at The Priceline Group for over a decade.  Given Defendants Hennessy and Mylod's longstanding affiliations with each other, demand is futile as to these defendants lack independence from one another.

**Defendants Mylod and Lang**

164.     Defendants Mylod and Lang served as members of the Audit Committee at all relevant times. As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  As

alleged herein, Mylod and Lang failed to ensure the integrity of the Company's internal controls, allowing the materially misleading financial statements to be disseminated in the Company's SEC filings and other disclosures. Thus, Mylod and Lang breached their fiduciary duties and are not interested, and demand is excused as to them.

**Defendant Dahnke and Lang**

165.    Dahnke is the co-CEO of L Catterton and L Catterton designated Dahnke and Farello as directors of the Company upon the closing of the Company's IPO.  Defendant Farello is currently a managing partner at L Catterton and Defendant Lang is on L Catterton's Senior Advisor Team.  L Catterton's affiliated entities beneficially own 14.5% of the Company's common stock as of March 31, 2021.  The 14.5% consists of (i) 6,994,354 shares of common stock held of record by CGP2 Zoom Holding, L.P. ("CGP2 Zoom"), (ii) 10,589,776 shares of common stock held of record by CGP2 Lone Star, L.P. ("CGP2 Lone Star") and (iii) 2,156,885 shares of common stock held of record by LCGP3 Accelerator, L.P. ("LCGP3 Accelerator").  CGP2 Managers, L.L.C. is the general partner for each of CGP2 Zoom and CGP2 Lone Star.  CGP3 Managers, L.L.C. is the general partner of LCGP3 Accelerator.  The management of each of CGP2 Managers, L.L.C. and CGP3 Managers, L.L.C. is controlled by a managing board. Defendant Dahnke is a member of the managing board of each of CGP2 Managers, L.L.C. and CGP3 Managers, L.L.C.

166.    Defendants Dahnke, Farello, and Lang each are employed at L Catterton together. Director Defendants Mylod, Dahnke, Farello, and Hennessy have served on the Board together since 2016. These conflicts mean these defendants could not adequately monitor the Company's operations and internal controls, and call into question the Individual Defendants' conduct. Thus, demand upon the Director Defendants would be futile

## COUNT I

### (Against Individual Defendants for Violations of
### Section 20(a) Of The Exchange Act)

167.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.   The Individual Defendants, by virtue of their positions with Vroom and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Vroom and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause Vroom to engage in the illegal conduct and practices complained of herein.

169.   Plaintiff, on behalf of Vroom, has no adequate remedy at law.

## COUNT II

### (Against the Director Defendants for Breach of Fiduciary Duty)

170.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

171.   The Director Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

172.   The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

173.   The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements

to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

174.    As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

175.    As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending and/or settling securities lawsuits and governmental investigations, severe damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### (Against the Director Defendants for Waste of Corporate Assets)

176.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

178.    As a result of the misconduct described above, the Director Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain

officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle actions addressing Defendants' unlawful actions.

179.   As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

180.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

## COUNT IV

**(Against Defendants Jones,
Moran and Roszkowski for Insider Trading)**

181.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.   Jones, Moran, and Roszkowski sold over $10.3 million worth of their personal Vroom shares, they were in possession of material, non-public information regarding the Company's lack of inventory and inadequate sales and support staff, both of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Vroom's inventory, sales, and support staff would destroy millions in market capitalization when revealed to the market.

183.   The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by Vroom insiders. The information which formed the basis of the sales of stock made by Defendants Jones, Moran, and Roszkowski was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to Vroom, which was usurped for the benefit of Defendants Jones, Moran, and Roszkowski and to the detriment of the Company.

184.   The use of this information by Defendants Jones, Moran, and Roszkowski was a breach of their fiduciary duty of loyalty.  Their insider sales of stock in December 2020, January

2021, and February 2021 were predicated upon their possession of material, adverse, non-public information to which they had access as Vroom insiders.

185.    Plaintiff, on behalf of Vroom, has no adequate remedy at law.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(A)    Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

(B)    Finding Defendants liable for breaching their fiduciary duties owed to the Company;

(C)    Directing Defendants to take all necessary actions to reform and improve the Company's corporate governance, risk management, and internal operating procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the rampant wrongful conduct described herein;

(D)    Awarding damages to the Company for the harm the Company suffered as a result of the Defendants' wrongful conduct;

(E)    Awarding damages to the Company for Defendants Bor and Stoltz's violations of Section 20(a) of the Exchange Act;

(F)    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

(G)    Awarding such other and further relief as is just and equitable.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: April 28, 2022

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Facsimile: (302) 397-2557
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiff*